FINCH v. FINCH.

1. An executor properly sold the property of his testator in October, 1862, on a credit of twelve months, and a year afterwards invested the total amount of the sale-bill in Confederate securities, which afterwards became worthless. *Held*, that this investment could not be sustained to the extent of the executor's own purchases at the sale, nor to the extent of sale notes not yet paid when the investment was made, but paid to the executor in good money after the war.
2. Under the statute, an executor purchasing at his own sale is liable to the parties in interest for the actual value of the property at the time

of sale, and must give bond, with surety, to the probate judge to account for the purchase money. The executor cannot relieve himself of this liability by payment to himself of the amount bid, at maturity, nor by failure to execute the required bond.

3. Where the same person is both debtor and creditor, the debt is paid by operation of law. But this principle did not make this executor's purchases assets in his hands, unless the beneficiaries so demanded, because the debt was payable to the probate judge and not to himself, and because Confederate money is not assets.

4. The order of the court below, directing the costs of this action to be paid out of the funds in the executor's hands, not disturbed.

  ·  MR. CHIEF JUSTICE SIMPSON *dissenting*.

Before PRESSLEY, Spartanburg, July, 1887.

This was an action against an executor for an account of the estate of his testator. The probate judge found a balance in defendant's hands on October 8, 1886, of $433.22, out of which he directed the executor to pay the costs of both parties and the executor's commissions, and to pay the remainder to the parties plaintiff. Other matters are stated in the opinion.

*Mr. Stanyarne Wilson*, for appellants.

*Messrs. Bomar & Simpson*, contra.

March 5, 1888. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. In 1862, during the late war, Miles A. Finch died, leaving a will which, among other things, declared in the 3rd clause as follows: "The remainder of my estate, real and personal, I desire my executor to sell on such terms as he may think will make it bring the most money, collect my notes, all of which, with the cash on hand, I desire shall be equally divided among all my children, share and share alike." The children surviving were Elizabeth, Louis L., Leonora F., and Louisa J. Thereafter, Elizabeth and Leonora F. dying intestate and without issue, Louis L. was appointed administrator of their estates, and he, together with the other surviving child, Louisa L., instituted this proceeding in the Court of Probate against the defendant, executor, for an account and division of the estate.

The defendant answered, that by order of the then ordinary of

Spartanburg County he sold, on October 24, 1862, the little residue of the estate upon a credit of twelve months; that the sale-bill amounted to $911.36, which was secured by good notes (except $4.50 paid cash in Confederate money), and the notes paid in Confederate money about October or November, 1863; that under the advice of counsel and the ordinary, he deposited the money with the Confederate States agent at Columbia, and received a "certificate of deposit," for which Confederate bonds were afterwards to be substituted; that this investment was the only one that could be made at that time, but the certificate, without any fault of his, became worthless, and that he had in his hands no estate for which he was accountable.

The judge of probate took the testimony, and found as matters of fact that the amount of $315.36 of the sale bill was for articles purchased by the executor himself at his own sale, among which was a bale of cotton, which he sold for gold after the war at a high price; and he also found that the purchases at the sale of D. G. Harris, $56, and of L. M. Gentry, $8.10, making $64.10, had not been actually paid in Confederate money at the time the investment for the even sum of $900 was made, but, on the contrary, that the executor advanced his own Confederate money, and collected these accounts in good money after the war. On these facts, the probate judge held that the investment discharged the executor as to everything, but his own account for purchases, and also those of Harris and Gentry, as above stated; but for those, reduced according to the scale of depreciation of Confederate money, established by act of the legislature, he held the executor chargeable, just as if they had been collected after the war. According to this view, there was due October 8, 1886, (after deducting the costs) the sum of $361.46, which, in equal parts, he decreed to the children.

Upon appeal by the defendant to the Court of Common Pleas, Judge Pressley held "that the executor should not have been held responsible for his own purchases, because he had paid for same in Confederate securities," and remanded the case to the Probate Court for the purpose of having the statement recast in accordance with that view, but confirming the decree of the Probate Court in all other respects. He further ordered that the appel-

lant, Benjamin Finch, have judgment against the respondents for the costs of the appeal.

From this decree the plaintiffs appeal upon the following grounds: 1. That his honor erred in holding that defendant should not be held responsible for his own purchases, and in not holding that he should account for them, as held by the probate judge. 2. That he erred in holding that he ever paid for his purchases. 3. That he erred in charging the plaintiffs, instead of defendant, with the costs of the action. 4. That he erred in allowing defendant judgment for the costs of the appeal to the Court of Common Pleas.

The relation between these parties was that of trustee and *cestui que trust.* The testator left certain property, to be disposed of in the manner directed by his will, of which the defendant was appointed executor. The testator died during the war, when values were much disturbed, but the will directed that the property should be sold in the manner the executor might think best. He sold it upon a credit of twelve months, and for Confederate prices. So far, the executor seems to have acted in accordance with the will; but there was another provision in the will—that the whole estate should be equally divided among testator's children. That has not been done, and the children have instituted this proceeding, asking an account from the executor; and he claims that when the sale bill fell due, he paid it all, including his own purchases, in Confederate money. which in turn was invested in Confederate securities, and as they became worthless, he has nothing in his hands to be accounted for, and he should be discharged.

The extraordinary financial condition of the country during the late war has given rise to many embarrassing questions, especially in reference to the accountability of fiduciaries, who had trust funds in their hands at that time. So far as the established principles of accountability would allow, the courts have ever shown a disposition to protect such trustees from loss, certainly where it appeared that they had acted in the line of their duty and in good faith. This court has gone as far as equity and justice would countenance in sustaining investments in Confederate securities by fiduciaries; but, as we think, without ever overlooking that

fundamental principle of accountability, that a trustee shall not be allowed to make profit to himself out of his trust. Such a result—forbidden under any circumstances—would be still more objectionable if allowed to arise out of transactions which took place amidst the general ruin of the period referred to. One of the rules which seems to have been adopted in such cases is, that to sustain a Confederate investment it must appear that the money so alleged to have been invested was, at the time, actually in the hands of the trustee—not irregularly or illegally, but "rightfully" there; and that it was not available in the due course of administration of his trust. See *Koon* v. *Munro*, 11 *S. C.*, 140, and 18 *Id.*, 374.

The sale was made during the war, and the notes taken with reference to Confederate prices. We suppose, therefore, it was incumbent on the executor to receive Confederate money from those purchasers who tendered it in payment. But we do not understand that it was allowable for the executor to charge himself with the sale bill in a lump—really purchasing the assets with his own Confederate money, and investing that for the bene-ficiaries—at the same time keeping and collecting the notes after the war. The courts will not sustain on the part of a fiduciary such speculative proceedings; and it was upon this principle that the purchases of Harris and Gentry, which were collected after the war, were not allowed, but were stricken from the investment which purported to cover them.

Then, what about the purchases of the executor at his own sale? For many years it was a point much debated in this State, whether a trustee to sell could legally purchase at his own sale, or such attempted purchase was void; but it seems to have been finally settled that "while such a sale was not utterly void, it will be set aside on the application of any one interested, and that without reference to the question whether the sale was fairly conducted, or a full and fair price paid." See *Black* v. *Childs*, 14 *S. C.*, 321, and the authorities there cited.

In reference to the purchase of an executor, the law was expressly declared by the act of 1839, and is now contained in sections 1994 and 1995 of the General Statutes, as follows: "It shall be lawful for any executor or administrator to become a

purchaser at the sale of the estate of his or her testator or intestate, under whatsoever authority the said sales may be made, and the property so purchased shall be vested in him or her; but he or she shall be liable to the parties interested for the actual value of the property at the time of the sale in cases where it shall have been sold at an under price. If any executor or executrix shall purchase any property at the sales of the estate of his or her testator, he or she shall give bond, with surety, to the judge of probate of the county, conditioned to account for the purchase money of the said property."

These sections were originally parts of the same act (1839), and, of course, must be construed together. They declare the terms on which an executor is allowed to purchase at his own sale. It will be observed that the first section includes administrators as well as executors and simply declares the liability of both for purchases at their own sales—"shall be liable to the parties interested for the actual value of the property at the time of sale in cases where it shall have been sold at an under price," &c. The second section includes only executors, and was really unnecessary, except for the purpose of requiring them to give bond to the judge of probate, "to account for the purchase money of the said property"; that is to say, to make good the liability declared in the first section. Only executors were required to give bond to the judge of probate, as administrators had already done so under the general law.

The law is watchful of the rights of those who are not *sui juris* or incapable of taking care of themselves; and we cannot think that the "bond with surety," required to be given by the executor to the probate judge, was intended to be no more than a mere note, to secure his purchases for twelve months, and at the end of that time to be *functus* or return to the executor, so that he could, without the consent of the probate judge or of the parties in interest, pay and cancel it like the sale note of a stranger, by simply charging himself with the amount in Confederate money, in order to invest it in Confederate bonds. This surely would be requiring the bond for very little purpose. See *Reynolds* v. *Timmons* (7 *S. C.*, 497), where it is said: "An ordinary was required to take two classes of bonds—one purely money bonds, &c., and the

other class, bonds of administrators or persons acting in a trust capacity. He was authorized to receive money in payment of the first class, and to discharge the obligors. The second class were bonds of a peculiar character, the condition of which required the faithful performance of certain acts, and those he was not empowered to settle and discharge."

We rather suppose that, as to the purchases of the executor at his own sale, the bond was intended to be a continuing security under the control of the probate judge, somewhat like an administration bond. Both the nature of the liability declared and the use of the word "account" show that such was the intention of the legislature. It is true, there is no evidence that this executor gave the bond required by law. It does appear, however, that he received and enjoyed the property which he bid off, and we cannot doubt that the question of his liability should be considered under the terms and principles declared by law, just as if he had executed the bond. *Lipscomb* v. *Seegers*, 19 *S. C.*, 430.

But it is urged that the debt for the executor's purchases, at the end of the credit given, twelve months, was paid to himself by operation of law—by force of the doctrine that a debt due by an executor to the estate he represents must be considered "as assets" in his hands; and as, at that time, there was no other currency in the country, these "assets" were in Confederate money. There is, certainly, such a principle, but, as it strikes us, it is not applicable to this case. In the first place, the debt was not due to the testator at the time of his death, but arose afterwards out of the sale of property which the executor held in trust, and, according to the bond which the law required, was not payable to himself, but to the judge of probate. The executor was not both creditor and debtor. It may be that the executor could not deny that he was chargeable with the debt "as assets," if, upon settlement, the beneficiaries demanded it; but they were not bound to do so—they had the option to do it, or not, as they saw fit. *Berry* v. *Hart*, 1 *S. C.*, 125; *Clowney* v. *Cathcart*, 2 *S. C.*, 395.

Besides, the principle does not apply where the alleged "assets" were not a legal tender, or, in any proper sense, "assets" at all. To give it effect in this case, would be a total misapplication.

*Crawford* v. *Crawford*, 17 *S. C.*, 525. In that case it was held, the Chief Justice delivering the judgment, that "while the rule of law is that a creditor is paid his debt when he becomes executor of his testator's estate, and as such receives assets applicable to such debt, yet this rule does not apply when the assets so received are Confederate money, unless the creditor was willing to receive it in payment." If Confederate money is not within the rule as to the payment of a debt due to the executor, we do not see why it should be as to the payment of a debt due by him. We think the judge of probate was right in charging the executor with the value of the property purchased by him at his own sale—reduced according to the scale of Confederate money, as established by law.

This makes it·unnecessary to consider the question of costs from the Probate to the Circuit Court.

The judgment of this court is, that the judgment of the Circuit Court be reversed and that of the Probate Court affirmed.

MR. JUSTICE MCIVER concurred.

MR. CHIEF JUSTICE SIMPSON, *dissenting.* There is no intimation in this case that the executor bought at his own sale property at an under-value. If he had done so, he should have been required to account under the act (1839) for the true value, which is the only effect which the act has on such cases. Having bought as other purchasers, at Confederate prices, and to be paid in Confederate money, no doubt, I see no reason why he should not be allowed the same privilege. as other purchasers, to wit, the right to make payment to himself when the debt became due; and that his liability for the investment of the amount paid in by him be determined by the same principles applicable to his other investments. I think the executor should have been held responsible for the notes not collected until after the war, as adjudged by the Circuit Judge, but he should have been discharged as to his own purchases. I cannot,·therefore, concur in this opinion.

Judgment reversed.